# WATERS *v.* KOPP.[*]

---

"LEGAL REPRESENTATIVES;" LIFE INSURANCE; CONTRACTS; TENANTS IN
COMMON.

1. The usual construction given the words "legal representatives," when
    used in an insurance policy, is that of "executor, administrator, and
    assigns," or "executor and administrator," thus making the policy
    payable to the estate of the insured in the absence or death of a
    named beneficiary.

2. The construction which parties put upon their contracts by their con-
    duct is of the highest value in settling its interpretation. The re-
    mark of Lord Chancellor Sugden, "Tell me what you have done under
    a deed and I will tell you what that deed means," quoted with ap-
    proval.

3. Where, upon the death of the beneficiary in a life insurance policy

---

[*]*"Legal Representatives."*—As to who are "legal representatives" within
meaning of life insurance policy, see note to *Rose* v. *Wortham*, 30 L.R.A.
609.

payable to the wife of the insured, if living, otherwise to his "legal representatives," the insured and his children enter into a contract in which it is recited .that the proceeds of the policy, upon the death of the insured, will inure to the benefit of the children, and by which each of the children agrees to contribute an equal amount to pay the annual premium under a penalty of a forfeiture of his right to share in its proceeds at the death of the insured upon a failure to contribute, in consideration of which the insured agrees to make no attempt to change the character of the policy so as to affect the rights of the contributing parties, and upon the failure of all of the children but one to continue their contributions, the insured procures the assignment of the. policy by the company to that one, the others, upon the death of the insured, cannot defeat the recovery of the proceeds by the assignee, on the ground that the policy was not assignable.

4. The rule that the purchase by a tenant in common of an outstanding title or encumbrance will inure to the benefit of his cotenant, is one of implication, and has no application in the case of an express *agreement* between the parties.

5. The right of the parties to an agreement, to share in the proceeds of a life insurance policy after the death of the insured, if they should continue to contribute towards the payment of the annual premiums, is not an "estate" of which they are tenants in common, but is a mere expectancy on the part of each, which, if they have so agreed as between themselves, will be defeated on his failure to continue to contribute, in .which event those continuing the contributions may take an assignment of the policy.

6. The court cannot make a new contract for parties who have already entered into one of a different tenor. (Distinguishing *Brashears* v. *Metropolitan L. Ins. Co.* 1 App. D. C. 420.)

No. 2054. Submitted February 4, 1910. Decided March 8, 1910.

HEARING on an appeal from a decree of the Supreme Court of the District of Columbia, sitting as a court of equity, by the complainant in a bill for the establishment of the assignment of a life insurance policy, who was also one of several defendants to a cross bill seeking to vacate such assignment, and for the distribution of the proceeds of the policy.

*Reversed.*

The COURT in the opinion stated the facts as follows:

On December 5, 1881, an insurance policy was issued by the Hartford Life & Annuity Insurance Company of Hartford, Connecticut, on the life of John Shea, for $10,000. It was payable "to his wife, Maria Shea, if living, otherwise to his legal representatives." Shea then had six children. The premiums on this policy, which was of the assessment kind, appear to have been paid quarterly by the wife, Maria Shea, until her death, which occurred May 7, 1900. She died seised of considerable real estate apparently bought out of the proceeds of a grocery and liquor business conducted by her in the name of her husband. After her death, the husband, instead of taking the rents of this real estate as tenant by the curtesy, permitted his children to take all but one seventh, and from these rents the premiums on the policy were paid until 1902, when Margaret Kopp, and some of the other children, filed a bill for sale of the real estate. The latter was sold, and in December, 1903, the six children, together with the father, entered into a written contract, by which, after reciting the policy of insurance, the payments of premiums thereon by the children, since her death, out of the rents accruing from the real estate, the proceedings for the sale of the real estate, they agreed to place in the hands of Margaret Kopp, out of their shares of the proceeds of sale, the sum of $300 each, or $1,800, for the purpose of paying the said premiums. The contract also contains the following stipulations:

"And it is further agreed between the undersigned that should said sum of money, held as aforesaid by said Margaret Kopp for the payment of said premium, become exhausted before the death of said John Shea, that each of the undersigned will keep up the payment of said premium thereafter, or contribute thereto according to their respective interests therein, under penalty of a forfeiture of their right in sharing in the proceeds thereof should they fail to make said contribution. And said insured, John Shea, hereby approves the stipulations in the foregoing agreement, and agrees with said par-

ties, in consideration of their abiding by the same, to make no effort in anyway whatever or to attempt in anyway to change the character of said policy so as to affect the rights of said parties contributing to the payment of premium as aforesaid to the full benefit of the value of said property, upon the death of said insured, as evidenced by his signature thereto."

The premiums were paid quarterly, in March, June, September, and December, in each year, out of this fund until it was exhausted by the payment due in June, 1906. When the September, 1906, premium fell due, it amounted to $150, and was paid by three of the children, Mrs. Kopp paying $37.50, Mrs. Jewell paying, $37.50, and the husband of Mrs. Waters paying the balance of $75.

The December, 1906, premium was $135.50, and, under the notice issued by the company, payment would not be accepted later than December 5, 1906. The matter having been brought to the attention of John Shea, the insured, the latter told Mr. Waters, husband of one of his children, that if he would pay the premium, he (Shea) would see that Mrs. Waters got the benefit of it. Thereupon, on December 5, 1906, Waters paid the assessment in question, $135. Some days later Shea asked for the policy, took it to the office of his lawyer, who sent it to the insurance company, bearing an assignment by the insured to Maria Waters, his daughter. It was returned with the consent of the company to the assignment indorsed thereon. Subsequently, and up to the death of John Shea, the insured, which occurred July 12th, 1908, Waters, for his wife, paid all the assessments on the policy, aggregating $836.50, no one of the other children contributing thereto.

Proof of Shea's death was duly made to the insurance company by Maria Waters, but objection being made by Margaret Kopp, one of the daughters, the company paid the amount of the policy to collectors appointed by the probate court, in whose hands it remains. Thereupon Maria Waters, the assignee of the policy, filed a bill to establish the assignment and to require the collectors to pay over to her the proceeds of the policy. All parties in interest were made defendants. **Two**

daughters of Shea, Elizabeth Jewell and Alice Smith, answered, admitting the assignment and that Maria Waters was entitled to the proceeds. Margaret Kopp and Annie Mulloy, also daughters of Shea, answered, alleging that the policy was not assignable by Shea; that he was not at the time mentally capable of executing an assignment, and that it was obtained by fraud and undue influence practised by Maria Waters and her husband upon the assignor. Subsequently, Mrs. Kopp and Mrs. Mulloy filed a cross bill, containing the same allegations, and praying that the assignment be held void, and for a distribution of the proceeds of the policy.

The court below passed a decree denying the prayers of the original bill and granting those of the cross bill, thus holding the assignment void and directing the collectors, after payment of the amounts advanced by the parties, to distribute one sixth of the proceeds of the policy to each of the five surviving children of Shea and one sixth to the administrator of a son who had died before the insured.

From this decree Mrs. Waters, the assignee of the policy, appeals.

*Mr. Irving Williamson* for the appellant.

*Mr. Wilton J. Lambert* and *Mr. Rudolph H. Yeatman* for the appellees.

Mr. Associate Justice GOULD, of the Supreme Court of the District of Columbia, who sat with the Court in the hearing and determination of the case in the place of Mr. Justice VAN ORSDEL, delivered the opinion of the Court:

To sustain the decree the appellees urge:

1st. That John Shea had no interest in the policy which he could assign to Mrs. Waters.

2d. That the assignment was invalid because of the relations of the parties as cotenants of the policy.

3d. That the assignment was invalid because of the fraud

practised, and the undue influence exercised, by Mrs. Waters and her husband upon John Shea.

1st. The policy was payable "to his wife, Maria Shea, if living, otherwise to his legal representatives." The question is as to the meaning of the term "legal representatives." In insur-·ance policies the natural and usual construction given these words is that of "executor, administrator, and assigns," or "executor and administrator," thus making the policy payable to the estate of the insured in the absence or death of a named beneficiary. (*Mutual L. Ins. Co.* v. *Armstrong,* 117 U. S. 597, 29 L. ed. 999, 6 Sup. Ct. Rep. 877; *Robinson* v. *Hurst* [*Mutual Reserve Fund Life Asso.* v. *Hurst*] 78 Md. 59, 20 L.R.A. 761, 44 Am. St. Rep. 266, 26 Atl. 956; *Johnson* v. *Van Epps,* 110 Ill. 551). While in some cases these words have construed rather forcibly; and to carry out the intention of the insured, to mean his children, or his wife and children, as in *Griswold* v. *Sawyer,* 125 N. Y. 411, 26 N. E. 464 (two judges dissenting), yet there is no reason for such effort in this case. Shea's six children were living when the policy was written, and it would have been both easy and natural to have made it payable to "his wife, if living, otherwise to his children," rather than to have incorrectly used the term "legal representatives" to designate the latter, had he at that time intended his children to take as such in the event of the death of his wife before the policy matured. The construction which parties put upon their contracts by their conduct is urged by appellees as of the highest value in settling its interpretation. This is true. As Lord Chancellor Sugden said in *Atty. Gen. ex rel. Quin* v. *Drummond,* 1 Drury & War. 363: "Tell me what you have done under a deed, and I will tell you what that deed means." Applying this principle of construction, appellees call attention to the term of the written contract already referred to between Shea and his six children, which recites that the proceeds of the policy, in case of the death of said Shea, inured to the benefit of the children. That this recital is not inconsistent with the assignability of the policy is made clear by the fact that in the same contract the

children required Shea to bind himself "in consideration of their abiding by the same [that is, keeping up the premiums], to make no effort in anyway whatever, or to attempt in anyway, to change the character of said policy so as to affect the rights of said parties contributing to the payment of premiums as aforesaid." The children failed to "abide by the same," which, by their own agreement, left him free to assign.

This view renders it unnecessary to consider whether appellees can raise the question of the assignability of the policy, the insurance company having consented to the assignment and paid the money into court.

2d. It is contended by appellees that as the children of Shea were cotenants of this policy as beneficiaries therein, that Maria Waters, one of the cotenants, could not take an assignment thereof, pay the premiums thereon, and recover the proceeds upon its maturity. This is based upon the recognized principle of law that a purchaser of an outstanding title or encumbrance upon the joint estate, for the benefit of one tenant in common, inures to the benefit of all, because there is an obligation between them, arising from their joint claim and community of interest, that one of them shall not affect the claim to the prejudice of the others. This rule has no application to the case under decision, for two reasons:

First, the rule is one which the law implies. In this case, the parties did not choose to rely upon it, but entered into an express agreement which superseded any the law might imply, and provided for a forfeiture of the interest of each who failed to comply with the terms of the contract. Each was perfectly competent to enter into this contract. It was not illegal, or fraudulent, or even unfair, and their rights must be determined by it.

Second, there really was no "estate" in which they were tenants in common. The most that can be said of their rights under the policy is that they had an expectancy conditioned by their own agreement upon their paying the quarterly premiums. Failing to pay, their estate vanished, also by their own agreement. And neither in law nor in equity was any one of

them inhibited from taking up the burden of payments after it had been thrown down, and receiving an assignment of the policy. This would be true in the absence of an express agreement. As it is, each expressly agreed in writing and under seal, that his "estate" existed, even *in futuro,* under penalty of a forfeiture of his right in sharing in the proceeds thereof should he fail to make such contribution, *i. e.,* his or her share of the premiums. That they failed, excepting Mrs. Waters, is undisputed. Under the circumstances it is immaterial whether they refused, or merely failed.

3d. The testimony disclosed no fraud or undue influence on the part of anyone in procuring the assignment of the policy. The evidence of any mental incapacity of Shea at the date he made it is slight and completely overcome by the testimony offered on this point by the appellants. It is suggested in appellees' brief that, in the event the decree is reversed, the case should be referred to the auditor to ascertain the money expended in premiums in keeping up the policy by the respective parties, with directions to distribute the proceeds in the proportions evidenced by the amounts respectively expended; and *Brashears* v. *Metropolitan L. Ins. Co.* 1 App. D. C. 420, is cited. But to so order would require this court to write a new contract for parties who had already entered into one of a very different tenor. They agreed to forfeit all their interest in the proceeds of the policy if they failed to pay the premiums. The court would necessarily be compelled to find that contract void before it could substitute one of its own construction. There is nothing in the record upon which to base such a finding.

For the reasons given the decree will be reversed, with costs, and the cause remanded for the entry of a decree establishing the assignment of the policy in question by John Shea to Maria Waters, the appellant, and directing the collectors of the estate to pay the proceeds thereof to the said Maria Waters.

*Reversed.*

A motion by the appellee Mrs. Waters, for a severance and the allowance of an appeal to the Supreme Court of the United States, was denied April 6, 1910. An application made to a justice of that court for the allowance of an appeal was granted April 27, 1910.