**BOARD OF DIRECTORS OF THE WASHINGTON CITY ORPHAN ASYLUM, Appellant,**

**v.**

**BOARD OF TRUSTEES OF THE WASHINGTON CITY ORPHAN ASYLUM, Appellee.**

No. 00–CV–1494.

District of Columbia Court of Appeals.

Argued Sept. 17, 2001.
Decided May 23, 2002.

Jeffrey A. Liesemer, with whom Robert J. Katerberg, Eric A. Rubel, and Robert J. Wagman, Jr., Washington, DC, were on the brief, for appellant.

J. Alan Galbraith, with whom M. Elaine Horn was on the brief, for appellee.

Robert R. Rigsby, Corporation Counsel, Lutz Alexander Prager, Assistant Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a brief for amicus curiae, the District of Columbia.

Before STEADMAN and WASHINGTON, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

## I.

This case presented the trial court with the difficult task of construing an 1828 Act of Congress that is far from clear. The statute incorporated a board of five trustees to constitute a corporation known as the Washington City Orphan Asylum, and assigned different authority and responsibilities to that board, appellee here, and to a second board, a board of directors and managers, our appellant. After working in apparent harmony for over a century and a half, the two boards fell into disagreement, with the result that the board of trustees has purported to oust the other board created by Congress. The trial court ruled that appellant board of directors and managers is without standing to sue over its ouster and, largely for that reason, alternatively ruled against that board's various claims on the merits. We hold that the purportedly ousted board has standing to sue, and we therefore remand the case to the trial court for both a fur-

ther consideration of the appellant's claims on the merits and, incidental thereto, for such further consideration of the legislative history of the statute as available materials permit.[1]

## II.

In 1815, the First Lady of the United States, Dolley Madison, and other prominent women in the District of Columbia founded the Washington City Orphan Asylum (WCOA) as an orphanage, and operated it in a non-incorporated form for a period of about thirteen years. Legislative history indicates that WCOA's founders attempted to incorporate in 1816, but were unsuccessful because the original proposed incorporators were married women who legally were prohibited from owning property at the time. On May 24, 1828, Congress adopted "[a]n Act to incorporate the trustees of the Female Orphan Asylum in Georgetown, and the Washington City Orphan Asylum in the District of Columbia." 6 Stat. 381, Chap. 88 (1828). The Female Orphan Asylum in Georgetown, created by the same Act of Congress, is an entirely separate entity and is not implicated here. The statute, except for two passages of marginal relevance, is set forth in the footnote.[2]

1. The trial court granted appellant's motion for an injunction pending trial, but denied appellant's motion for an injunction pending appeal. Appellant moved in this court for an injunction pending appeal. We ordered the motion for injunctive relief consolidated with the appeal from the trial court's final order. We were not satisfied that the criteria for granting injunctive relief pending appeal were met. The motion for injunction pending appeal becomes moot with the issuance of this opinion. Upon remand, appellant is free to move with additional support for an injunction pending further proceedings in the trial court.

2. Chap. LXXXVIII.—*An Act to incorporate the trustees of the Female Orphan Asylum in Georgetown, and the Washington City Orphan Asylum in the District of Columbia.*
 *Be it enacted, & c.,* ... [Applies to the Female Orphan Asylum of Georgetown.]
 Sec. 2. *And be it further enacted,* That William Hawley, John P. Van Ness, Nathan Towson, Obadiah B. Brown, and James Larned, and their successors in office, to be appointed as is hereinafter directed, are hereby made, declared and constituted a corporation and body politic in law, and in fact, to have continuance forever, under the name, style, and title of "The Washington City Orphan Asylum."
 Sec. 3. *And be it further enacted,* That all and singular the lands, tenements, rents, legacies, annuities, rights, privileges, goods, and chattels, heretofore given, granted, devised or bequeathed to either of said asylums, or to any person or persons for the use thereof, or that have been purchased for, or on account of the same, be, and they are hereby, vested in, and confirmed to, the said corporations respectively, and that they may purchase, take, receive, and enjoy any lands, tenements, rents, annuities, rights or privileges, or any goods, chattels or other effects, of what kind or nature soever, which shall, or may hereafter be given, granted, sold, bequeathed or devised unto either of them, by any person or persons, bodies politic or corporate, capable of making such grant, and to dispose of the same: *Provided,* The clear annual income of property to be acquired by either of said corporations, shall at no time exceed the sum of three thousand dollars.
 Sec. 4. *And be it further enacted,* That the said corporations respectively, by the name and style aforesaid, be, and shall be hereafter, capable, in law and equity, to sue and be sued, within the District of Columbia, and elsewhere, in as effectual a manner as other persons or corporations can sue or be sued, and that they shall adopt and use a common seal, and the same to use, alter or change at pleasure, to appoint a treasurer and secretary, and such other officers as they may deem necessary and proper, to assign them their duties, and fix their compensation, and to remove any or all of them, and appoint others, as often as they shall think fit, and to make such by-laws as may be useful for the government of the said asylum, and not inconsistent with the laws of the United States, or the laws in force in the District of Columbia, and the

Section 2 of the 1828 Act identifies five men and constitutes them, as well as their successors, "a corporation and body politic in law." The members of the current Board of Trustees (Trustees) of WCOA assert that they are the successors of the five incorporators. Section 3 prescribes that all property belonging to the unincorporated asylum be vested in the corporation, and authorizes the corporation to buy and sell property and to receive donations. Section 4 grants the corporation the ability "to sue and be sued" and "to appoint a treasurer and secretary, and such other officers as they may deem necessary and proper, to assign them their duties, and fix their compensation ... and to make such by-laws as may be useful for the government of the said asylum...."

Section 6 deals with the appointment and functions of directors, and states in part:

> same to alter, amend or abrogate at pleasure.
> SEC. 5. *And be it further enacted,* ... [Applies to the Female Orphan Asylum of Georgetown.]
> SEC. 6. *And be it further enacted,* That the present managers of the Washington City Asylum, called by the article of association "a board of trustees," may continue in office, discharging the duties of the same, until the second Tuesday in October next, at which time, and on the same day in each year thereafter, said corporation, by those who from their by-laws may be qualified to vote, shall be regulated, and the officers thereof appointed, agreeably to the provisions of this act; that is to say, there shall be appointed a first, and a second female directress, and also fifteen female managers; and these directresses and managers, a majority of whom shall be necessary to do business, at such time and place as they may direct, shall appoint a treasurer and secretary, and such other officers; and also perform such other duties as the by-laws may direct: *Provided,* No by-law shall be enacted inconsistent with any law now existing in the District of Columbia.

[T]here shall be appointed a first, and a second female directress, and also fifteen female managers; and these directresses and managers, a majority of whom shall be necessary to do business, at such time and place as they may direct, shall appoint a treasurer and secretary, and such other officers; and also perform such other duties as the by-laws may direct....

Section 7 specifically provides to the directors additional authority regarding underage children who were not to leave the asylum without the consent of those directing the institution. The current members of the Board of Directors (Directors) of WCOA assert that they are the successors of the original directors and managers.

In 1927, WCOA began to operate under the name of "Hillcrest, A Children's Village." The only version of the so-called constitution of WCOA (actually by-laws) brought to the attention of this court is

> SEC. 7. *And be it further enacted,* That when any destitute male or female child may be received into the asylum with the approbation of the parent, guardian or friends who may have the care of said child, they shall not thereafter be at liberty to withdraw or leave the asylum without the consent of the directors, until, if a male, he shall attain the age of twenty-one years, or if a female the age of eighteen years: but, up to the periods and ages aforesaid, they shall remain subject to the direction of the asylum, or those to whom, by said asylum, they may be bound, unless by consent given by those directing the institution they may be exonerated from service previous to attaining those respective ages.
> SEC. 8. *And be it further enacted,* That any vacancy which from death, resignation, or otherwise may happen in any of the offices or places of said asylum, shall be supplied or filled after the mode to be prescribed in their by-laws; and also in pursuance of said by-laws, power shall be possessed to alter and amend the same from time to time, and to remove and appoint to office whenever it shall be deemed advisable to do so.
> APPROVED, May 24, 1828.

the constitution as amended in 1958. The 1958 constitution divided responsibilities between the Trustees and the Directors and provided that changes in the constitution required the concurrence of both boards. In the 1950s, Hillcrest ceased to operate an orphanage and, in 1970, Hillcrest ended its residential program entirely. Thereafter, WCOA continued to provide counseling services to destitute children in the District of Columbia under the name "Hillcrest Children's Center."

Hillcrest Children's Center's current mission is to provide counseling and psychiatric treatment to children and families in the District of Columbia. In March 1998, the Trustees informed the Directors that they would discontinue funding Hillcrest Children's Center and suggested that the Directors incorporate in order to operate it by themselves. By a board resolution of February 25, 2000, the Trustees repealed the constitution of WCOA and replaced it with new by-laws eliminating the role of the Board of Directors entirely.[3] The Trustees advised the Directors that funding for Hillcrest Children's Center would be terminated effective June 30, 2000.

On June 19, 2000, the Directors filed a complaint for injunctive relief and enforcement of trust, asserting that the Trustees in their governance of the corporation had engaged in breaches of fiduciary duty, arbitrary and capricious action, diversion of funds, conversion of funds, and *ultra vires* acts, and demanded an accounting. The Superior Court granted a preliminary injunction requiring the Trustees to continue to fund WCOA at the rate of approximately $20,000 per month. The Trustees then moved for a judgment on the pleadings, asserting that the Directors lacked standing and capacity to bring the action. The trial court granted the Trustees' motion for judgment on the pleadings, concluding that the Trustees constituted the "sole governing board" of WCOA and that, for that reason, the Directors lacked standing to pursue any claims against the corporation. In the alternative, the court granted a judgment for defendant Trustees on the merits which appeared to be a summary judgment because of the language used and because the court considered materials outside the pleadings. This timely appeal followed. Corporation Counsel, as *amicus curiae*, filed a brief arguing that the dismissal of the complaint for lack of standing should be reversed, but taking no position on the merits.

### III.

We turn first to the issue of standing or capacity to bring this action, as this threshold issue must be considered before we turn to the trial court's disposition of the merits. In *Speyer v. Barry*, 588 A.2d 1147, 1160 (D.C.1991) (citation omitted), we stated that for a court to consider the merits of a case "the 'constitutional' requirement of a 'case or controversy' and

3. The "Washington City Orphan Asylum Board Resolution," signed by four members of the Board of Trustees and dated February 25, 2000, states:

WHEREAS the Washington City Orphan Asylum ("WCOA") has heretofore operated under a constitution as amended in 1828, 1870, 1920 and 1937;
WHEREAS the Board of Trustees of WCOA determines that the constitution should be repealed;

WHEREAS the Board of Trustees of WCOA wishes to adopt the attached by-laws;
WHEREAS the Board of Trustees believes the attached by-laws will further the proper governance of WCOA;
NOW, THEREFORE, pursuant to the power conferred in the Board of Trustees under Section 4 and 8 of 6 Stat. 381, Chap. 88 (1828), the Board hereby repeals the constitution and adopts the attached by-laws as the by-laws of WCOA.

the 'prudential' prerequisites of standing" must be present. This court looks to federal standing jurisprudence to assist in the identification of cases and controversies that properly may be considered, although this court is not bound by "case or controversy" requirements set forth in Article III of the Constitution. *See Fisher v. Government Employees Ins. Co.*, 762 A.2d 35, 38 n. 7 (D.C.2000); *Community Credit Union Servs., Inc. v. Federal Express Servs. Corp.*, 534 A.2d 331, 333 (D.C.1987) (citation omitted).

■ "[T]o meet the minimum requirements of a case and controversy, a plaintiff must show that it has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ... that the injury fairly can be traced to the challenged action, and that it is likely to be redressed by a favorable decision." *Community Credit Union, supra*, 534 A.2d at 333 (citations and internal quotations omitted). "[U]nder prudential principles of standing, a plaintiff may assert only its own legal rights, may not attempt to litigate generalized grievances, and may assert only interests that fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* (internal quotations omitted) (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Whether appellants have standing is a question of law which we consider on appeal *de novo*. We review the underlying factual determinations under the clearly erroneous standard. *See Gaetan v. Weber*, 729 A.2d 895, 897 (D.C.1999).

■ The Directors and Corporation Counsel, as *amicus curiae*, argue several bases for according the Directors standing. Because it is most clearly dispositive of the issue, we consider first the argument of Corporation Counsel that "when a private person has a special interest in a charitable corporation's conformity with its act of incorporation, that person has standing to sue for enforcement in compelling circumstances, such as when the action threatens to alter the fundamental nature of the institution. In the present case, the board of directors has that special interest and compelling circumstances exist." We note that the Congressional charter, the Act of May 24, 1828, creating the Washington City Orphan Asylum in the District of Columbia, Section 6, specifically confers authority on two female directresses and fifteen female managers, a body which the Directors claim as their predecessor in interest. The charter specifies that the directresses and managers, "a majority of whom shall be necessary to do business, at such time and place as they may direct, shall appoint a treasurer and secretary, and such other officers; and also perform such other duties as the by-laws may direct." The statute also gives the directresses and managers the authority to release children from the Orphan Asylum when they see fit to do so, an authority which comes into play only when the corporation operates as a home for orphans. They apparently have functioned as a self-perpetuating board, not subject to appointment or removal by the Trustees, and have participated in managing WCOA since incorporation in 1828. The Trustees, who assert that they are the successors of the five incorporators, voted to repeal the constitution and to adopt by-laws that divest the Directors of all the functions assigned to them under the 1828 Act.

The Directors and Hillcrest Children's Center would suffer "actual injury" with the termination of the financial support it receives from WCOA Trustees. The Directors are asserting their own interest in serving in the capacity accorded them by

the statute, not solely the interest of the youth they serve. The Directors are not asserting merely a generalized grievance, because their role, as prescribed in the Congressional charter, will be terminated through the actions of the Trustees. We are persuaded by Corporation Counsel's argument that, on the strength of the role the statute assigned to the "directresses and managers," the Directors have standing to bring this case before the court.[4]

The arguments of the Directors in support of their standing are consistent with that of Corporation Counsel. The overarching issue on which the Directors seek to be heard is whether the Trustees have the authority to terminate the statutorily-created role of the Directors in the corporation. The Directors contend that they have standing as either co-trustees or subtrustees, or as persons holding a special interest in a charitable trust under *Hooker v. Edes Home*, 579 A.2d 608 (D.C.1990)

and the RESTATEMENT (SECOND) OF TRUSTS.[5] The Trustees argue that WCOA is not a charitable trust, and that therefore arguments regarding charitable trusts are inapposite. Without reaching the merits of whether principles that apply to charitable trusts apply generally to nonprofit corporations,[6] we are satisfied that the Directors have made colorable arguments regarding their status as persons who have a special interest in the enforcement of a trust or as intermediate beneficiaries of a trust sufficient to give them standing.

In *Hooker, supra*, 579 A.2d at 611 n. 8, applying the parties' assumptions regarding the law, we stated that the rules that apply to charitable trusts govern the standing issue with regard to a charitable corporation. We held that the appellants had standing as they were members of a class, having a "special interest" distinct from the public at large "[b]ecause the

---

**4.** We need not decide whether we agree with the sweeping view expressed by one court as follows:

> We believe an officer, director and a member of a non-profit corporation is not without standing to question the management and conduct of other officers and directors which are alleged to be in violation of the By-Laws and Articles and against the purposes of the corporation. If such an individual lacks standing, who would have it? We regard the public as having a clear interest in non-profit corporations from the standpoint of the faithful administration of the affairs of the corporation.

*Morgan v. Robertson*, 271 Ark. 461, 609 S.W.2d 662, 665 (Ct.App.1980).

**5.** RESTATEMENT (SECOND) OF TRUSTS § 391 (emphasis added):

> A suit can be maintained for the enforcement of a charitable trust by the Attorney General or other public officer, or by a *co-trustee*, or by a person who has a *special interest* in the enforcement of the charitable trust, but not by persons who have no special interest or by the settlor or his heirs, personal representatives or next of kin.

**6.** RESTATEMENT (SECOND) OF TRUSTS § 348 cmt. f:

> Ordinarily the principles and rules applicable to charitable trusts are applicable to charitable corporations. Where property is given to a charitable corporation without restrictions as to the disposition of the property, the corporation is under a duty, enforceable at the suit of the Attorney General, not to divert the property to other purposes but to apply it to one or more of the charitable purposes for which it is organized. Where property is given to a charitable corporation and it is directed by the terms of the gift to devote the property to a particular one of its purposes, it is under a duty, enforceable at the suit of the Attorney General, to devote the property to that purpose. . . .
>
> On the other hand, some of the rules applicable to charitable trusts are not applicable to charitable corporations. Thus, if property is bequeathed to a charitable corporation, the income to be used for one of its charitable purposes, it is not subject to a statutory rule requiring accountings in a probate court which is applicable to charitable trusts.

will, charter, and by-laws of the corporation establish a set of criteria identifying a limited class of potential beneficiaries...." *Id.* at 609. The class in *Hooker* was composed of female, indigent, elderly widows, who had resided in Georgetown for at least five years. *Id.* at 615, 617.

Cases decided in other jurisdictions lend support to this basis for according the Directors standing to bring this action against the Trustees of WCOA. In *Holt v. College of Osteopathic Physicians and Surgeons*, 61 Cal.2d 750, 40 Cal.Rptr. 244, 394 P.2d 932 (1964), the Supreme Court of California noted that while it is true that the trustees of a nonprofit corporation do not possess all the attributes of a trustee of a charitable trust, the individual trustees in either case are solely responsible for administering the trust assets, and are fiduciaries in performing their trust duties. *Id.* at 936–37. In holding that the plaintiff trustees had the capacity to bring an action against the majority of trustees to enjoin any breach of trust that is threatened, the court considered the RESTATEMENT (SECOND) OF TRUSTS and statutory law supporting the conclusion that the minority directors or "trustees" of the charitable corporation were empowered to bring an action against the majority trustees. *Id.* at 937. We contrast the instant case with *Steeneck v. University of Bridgeport*, 235 Conn. 572, 668 A.2d 688, 689–90 (1995), where the Supreme Court of Connecticut considered whether a life trustee of a nonprofit corporation chartered in 1927 by special act of the legislature had standing to sue the term trustees.[7] The court held that the life trustee did not have a statutory or common law basis for asserting standing, as the position of life trustee was an honorary position and did not attach any duty to manage the affairs or control the operations of the university. *Id.* at 694, 696. The court stated that "it may well be appropriate to treat charitable corporation directors like actual trustees for purposes of standing to enforce the charity's purposes." *Id.* at 696. The *Steeneck* court, however, found it dispositive that the life trustees were given no managerial or operational role in the university's governance. *Id.* The instant case differs in that the Act of Congress incorporating WCOA assigned specific functions and management responsibilities, and arguably general management responsibilities, to the directresses and managers.[8]

As the Trustees and, to some extent the trial court, relied on *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), and *In re Antioch University*, 418 A.2d 105 (D.C. 1980), we consider the applicability of those cases.[9] In *Dartmouth College*, the

7. The charter vested the "rights, powers and privileges" of the university in a board of trustees. The by-laws created three categories of trustees: term trustees were given the authority to vote on board action, hold office, and serve as members and chairpersons on executive committees, while life and honorary trustees were not permitted to vote or hold any office. *Id.* at 690, 609 S.W.2d 662.

8. Appellee Trustees acknowledged that from the time WCOA was created, as prescribed by the Act of Congress, "the Lady Managers [Directors] would manage the day-to-day operations of running an orphanage."

9. In its Order dated October 4, 2000, the trial court stated:

> What resolves the issue of control is, instead, that the 1828 grant of authority by Congress awards to the defendant board, as successor to the original five incorporators, full and exclusive power to manage WCOA's assets and to direct its activities. Congress's grant, like defendant's exercise of its powers, is wholly consistent with *The Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). Neither the original grant of authority, nor any subsequent enactment or decision, has modified defendant's singular role in gov-

Supreme Court held that a royal grant had vested all authority for the operation of a charter in a single, self-perpetuating board of trustees. This grant was deemed a contract. Therefore a new state law creating a board of overseers was held to have impaired the contract in violation of the Contracts Clause of the United States Constitution. *Dartmouth College, supra,* 17 U.S. at 624–26. The Act of May 24, 1828, which created WCOA, specifically refers to, and confers authority on, directresses and female managers. The Directors had a role at the inception of the charter, whereas in *Dartmouth College* the New Hampshire legislature attempted to create an additional governing body—a board of overseers—and add additional members to the existing board of trustees for the university even though the original grant had vested governing authority in a single board of trustees. *Id.* at 625–26. In *Dartmouth College,* the Supreme Court did not determine that bipolar organizations were impermissible; only that in that particular case governance had been vested in a single governing body and that, therefore, an attempt to divest the governing body of its authority was in violation of the Contracts Clause.

In *In re Antioch University,* the university's Articles of Incorporation stated: "[a]ll of the rights and powers of the corporation and the entire control and management of its College, property and affairs shall be vested in and exercised by a Board of Trustees composed of twenty-five (25) persons." *In re Antioch University,*

*supra,* 418 A.2d at 112. The entire governance authority over the university rested with the Board of Trustees. Thus a unit of the university—the law school—that had not been granted rights under the articles of incorporation, was held to be without authority to maintain an action to enjoin the university from exercising or asserting control over the fiscal policies or administrative management of the law school. *Id.* at 107, 114. In the case of WCOA, while Section 2 of the Act of May 24, 1828, declares and constitutes the Trustees and their successors "a corporation and body politic in law," it also constitutes in Section 6 the directresses and managers as a board, "a majority of whom shall be necessary to do business," assigns them specific authority over orphans, and arguably assigns them general management responsibilities.[10]

For the foregoing reasons, the Directors have standing to bring suit and be heard with respect to the matters alleged in the several counts of their amended complaint. Their amended complaint alleges, specifically, that the Trustees will breach a fiduciary duty if they follow through on their proposal to end all funding to the operating unit of WCOA but instead fund such charitable organizations (including possibly a separate re-incorporated Hillcrest Children's Center) as the Trustees may select; that the Trustees would thereby arbitrarily and capriciously contravene their statutory and "constitutional" mandates; that they would effect an unauthorized diver-

---

erning the affairs of WCOA. *See, e.g., In re Antioch University,* 418 A.2d at 105, 113 (D.C.1980). That WCOA is an eleemosynary institution with aims or interests not exclusively educational does not remove it from the reach—or the reasoning—of the *Dartmouth College* case and its posterity.

**10.** The trial court also relied on provisions of the District of Columbia Nonprofit Corpora-

tion Act (DCNCA) to deny standing. D.C.Code §§ 29–502(7), –506, –518 (1996). However, as WCOA was organized long before the DCNCA was enacted and no evidence was presented that WCOA has elected to accept the provisions of the act, the trial court's reliance was misplaced. D.C.Code §§ 29–503, –599.3 (1996).

sion of the trust funds; would convert those funds; and would act *ultra vires;* the amended complaint also seeks an accounting. All these matters will be dealt with in appropriate further proceedings.

## IV.

We turn now to the second basis for the trial court's ruling. In its dispositive order, the court stated: "In the alternative, all material facts, as well as controlling law, establish that defendant [Trustees] alone retains power to direct the affairs of WCOA and that judgment must be entered in defendant's favor on each of the six counts set forth in plaintiff's amended complaint." In so ruling the trial court used the language of an order granting summary judgment. On appeal, the Directors argue that the court erred in that there were genuine issues as to material facts. It is not correct, however, to view the court's ruling as one granting summary judgment. The ruling was, at bottom, a legal ruling based upon the court's construction of the Act of May 24, 1828.

■■ It is true that the court considered matters outside the pleadings in making its ruling, and that when a court relies at all on such materials it normally converts a Super. Ct. Civ. R. 12(c) motion for judgment on the pleadings into one for summary judgment. *Bell v. Jones,* 566 A.2d 1059, 1060 (D.C.1989); *Shehyn v. District of Columbia,* 392 A.2d 1008, 1011 n. 1

(D.C.1978). When a court is considering appropriate materials in order to construe a statute, however, the court is in the process of arriving at a ruling on a question of law. *Fogg v. Macaluso,* 892 P.2d 271, 273 (Colo.1995) (en banc); *Staley v. Missouri Dir. of Revenue,* 623 S.W.2d 246, 248 (Mo.1981) (en banc) (citing *State ex rel. Igoe v. Bradford,* 611 S.W.2d 343 (Mo. Ct.App.1980)); 2A Sutherland, Statutes and Statutory Construction § 45:02 at 14–15 (Norman J. Singer ed., 6th ed.2000).

In moving for judgment on the pleadings, the Trustees argued that the Directors' "lack of capacity to bring suit is fatal to each and every count of the amended complaint...." The trial court agreed, though we do not, with the Trustee's argument regarding the Directors' lack of capacity to sue, and that conclusion permeated the trial court's consideration of all six counts of the amended complaint. It is appropriate, therefore, for the trial court to review the disposition of those counts on remand. As the trial court will find it necessary to revisit the construction of the Act of May 24, 1828, in order to deal with the merits issues, we make a few observations about that task.

## V.

■■ The legislation in question here enacted a particular corporate charter. Legislation confers corporate power through general or special statutes.[11] *See*

---

11. To examine charters granted by special acts of a legislature we use the same rules of construction that we use to examine articles of incorporation adopted pursuant to general law. *See Dempster Mfg. Co. v. Downs,* 126 Iowa 80, 101 N.W. 735, 736 (Iowa 1904) (citation omitted); *People ex rel. Moloney v. Pullman's Palace–Car Co.,* 175 Ill. 125, 51 N.E. 664, 668 (1898); 7A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 3640, at 228 (perm. ed., rev.vol, 1997). *But see North Side Ry. Co.*

*v. Worthington,* 88 Tex. 562, 30 S.W. 1055, 1058 (1895) (dicta). The intent of the legislature governs the interpretation of both a special and a general act of incorporation, as both constitute legislative acts. *See Casper v. Kalt–Zimmers Mfg. Co.,* 159 Wis. 517, 149 N.W. 754, 756 (1914). In *Casper,* 149 N.W. at 756 (citations and internal quotations omitted), the Supreme Court of Wisconsin stated:

The charter of a corporation is a legislative grant-just as much so when incorporated under a general law as by special act. An

*Thomas v. Railroad Co.,* 101 U.S. 71, 82, 25 L.Ed. 950 (1879); *Oregon Ry. and Navigation Co. v. Oregonian Ry. Co.,* 130 U.S. 1, 20–1, 9 S.Ct. 409, 32 L.Ed. 837 (1889); 3 SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 64:5 at 336–37 (Norman J. Singer ed., 6th ed.2001). State legislatures generally exercise the power to create corporations. Article I, Section 8, Clause 17 of the United States Constitution grants to the Congress of the United States the power to "exercise exclusive legislation in all cases" over the District of Columbia. Accordingly, Congress has the power to create corporations in the District. *See Stoutenburgh v. Hennick,* 129 U.S. 141, 148–49, 9 S.Ct. 256, 32 L.Ed. 637 (1889); *Huntington v. Savings Bank,* 96 U.S. 388, 391, 24 L.Ed. 777 (1877). Congress exercised its local legislative authority to incorporate WCOA in 1828.

▮▮▮▮ Principles of statutory construction guide our interpretation of the Act of May 24, 1828, which created WCOA.[12] In construing acts of Congress, a court starts with the premise that the meaning of a statute must be sought in the language in which the act is framed, and if that is plain then the sole function of the court is to enforce it according to its terms. *See Tibbs v. United States,* 507 A.2d 141, 143 (D.C.1986) (citing *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)); *Kleiboemer v. District of Columbia,* 458 A.2d 731, 737 (D.C.1983). If the words of the statute are clear and unambiguous, then the trial court must give effect to their plain and ordinary meaning. *See District of Columbia v. Acme Reporting Co.,* 530 A.2d 708, 712 (D.C.1987) (citation omitted) ("In construing acts of Congress, 'we must look first to the language of the statute and, if it is clear and unambiguous, give effect to its plain meaning'.").[13]

The Act of Congress creating WCOA is not clear on its face, as the language of the statute is capable of being understood in different ways. Most notably, Section 6 appears rife with ambiguities and lacunae. Section 6 describes the then-existing man-

---

amendment to a charter is a legislative act just as much so when made in pursuance of a provision in its charter or in a general law as by special act. . . .

When the Legislature authorizes a course of procedure whereby a charter may be acquired or amended, action in conformity thereto does not create the charter or make the amendment, but both come into existence through the operation of the statute. The amendment is the act of the Legislature the same as the charter itself, and neither has existence except as conferred by statute.

12. A leading treatise notes: "The rules governing the construction of charters of corporations are, for the most part, the same as those which govern the construction and interpretation of statutes, contracts and other written instruments. . . ." 7A FLETCHER, *supra,* § 3640, at 226–27. Fletcher goes on to note, however, that a difference has been indicated "between corporate charters and other contracts [with respect to] the use of evidence to aid in reaching the intent of the parties." *Id.* at 227–28. For that proposition, the Treatise cites *Casper, supra,* 159 Wis. 517, 149 N.W. 754. The difference is that if the ascertainment of the intent of the parties becomes an issue of fact in a contract case, that issue is submitted to the jury. *See Rastall v. CSX Transportation, Inc.,* 697 A.2d 46, 50–51 (D.C. 1997). There is no role, however, for the jury in the construction of a statute, which presents only a question of law. "No evidence of the intent on the part of their framers or makers either individually or collectively is competent." *Casper, supra,* 149 N.W. at 757. The rules of statutory construction control. *See* 2A SUTHERLAND, *supra,* § 45:02, at 6–19.

13. We also have explained that examining the plain wording is not always the last or the most illuminating step in statutory interpretation, as this court has found it appropriate to look beyond the literal meaning and apply exceptions in certain situations. *See Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc).

agers of the Washington City Asylum, called by the articles of association "a board of trustees," but fails to identify them. Section 6 also prescribes a role for directresses and managers and gives them the authority to "appoint a treasurer and secretary, and such other officers; and also perform such other duties as the by-laws may direct," even though Section 4 also grants the corporation the power to "appoint a treasurer and secretary, and other officers as they may deem necessary...." In addition, whether the board of trustees and especially the board of directresses and managers are self-perpetuating is not clear.

As the Act of May 24, 1828, contains ambiguities, the trial court will be required to ascertain legislative intent.[14] In *Tenley & Cleveland Park Emergency Committee v. District of Columbia Board of Zoning Adjustment*, 550 A.2d 331, 334 n. 10 (D.C. 1988) (citing *Rosenberg v. United States*, 297 A.2d 763, 765 (D.C.1972)), we stated that "[o]ur primary goal is to ascertain and give effect to the intent of the legislative body that drafted the language." *See also District of Columbia v. Onley*, 399 A.2d 84, 86–87 (D.C.1979).

■■■ Each provision of the statute should be given effect, so as not to read any language out of a statute "whenever a reasonable interpretation is available that can give meaning to each word in the statute." *School St. Assocs. Ltd. P'ship v. District of Columbia*, 764 A.2d 798, 807 (D.C.2001) (en banc) (citing *Thomas v. District of Columbia Dep't of Employment Servs.*, 547 A.2d 1034, 1037 (D.C.1988) ("A basic principle is that each provision of the

statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.")). *See also 1137 19th St. Assocs. Ltd. P'ship v. District of Columbia*, 769 A.2d 155, 161 (2001) (citation and internal quotations omitted) ("[E]ffect must be given [to] every word of a statute[,] and interpretations that operate to render a word inoperative should be avoided."). The words of the act of Congress "are to be read in [] light of the purpose of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice." *School St. Assocs. Ltd. P'ship, supra*, 764 A.2d at 805–806 (citation and internal quotation omitted). The meaning of statutory language "must be derived from a consideration of the entire enactment against the backdrop of its policies and objectives." *Tenley & Cleveland Park Emergency Comm., supra*, 550 A.2d at 334–35 n. 10 (citing *Carey v. Crane Serv. Co.*, 457 A.2d 1102, 1105 (D.C.1983)).

■■■ The charter's content and contemporaneous history should be utilized to construe the charter's meaning. *See Union Nat'l Bank of St. Louis v. Matthews*, 98 U.S. 621, 626, 25 L.Ed. 188 (1879). In *Casper* the court stated: " 'charters' are 'legislative acts,' and such acts must be construed from their *contents, contemporaneous history, and other legitimate aids* to their proper construction." *Casper, supra*, 149 N.W. at 757 (emphasis added). Regarding the proposition that a corporation may waive provisions of its charter, the court said:

14. "In all cases the object is to see what is the intention expressed by the words used. But, from the imperfection of language, it is impossible to know what that intention is without inquiring further, and seeing what the circumstances were with reference to which [of] the words were used, and what was the

object, appearing from those circumstances, which the person using them had in view; for the meaning of the word[s] varies according to the circumstances with respect to which they were used." 2A SUTHERLAND, *supra*, § 45:05, at 26–27 (quoting *River Wear Comm'rs v. Adamson*, LR 2 AC 743 (1877)).

[T]he vital objection to holding that a charter provision may be annulled by previous waivers is that no one upon reading a charter under which a corporation has existed for some time could tell what provisions were in force and what had been annulled by previous conduct of the corporation. The reasons suggested why a court, even though it had jurisdiction, should not reform a charter apply more strongly here. A party interested in a corporation has a right to rely upon the fact that its charter is what it purports to be. He cannot be met with the statement that such and such provisions of it have been annulled through disregard in the past. Here again the statute as to how charters may be amended must control. *To drop out a provision of a charter is an amendment of it.* Any material change in the fundamental law of a corporation is an amendment

*Id.* (citation omitted) (emphasis added).[15] *See also Northern Trust Co. v. Snyder*, 113 Wis. 516, 89 N.W. 460, 464 (1902) ("The resolution, like all resolves, laws, by-laws and ordinances of a legislative body, must speak for itself, in the light of those things that may be legitimately resorted to, to aid in its construction, which by no means includes parol evidence, of the members of the body concerned in its adoption, as to what they intended thereby."); *Boston and Lowell R.R. Corp. v. Salem and Lowell R.R. Co.*, 68 Mass. (2 Gray) 1, 28–9 (1854) ("In construing this act of incorporation, we are to bear in mind the time and circumstances under which it was made, but more especially to take into consideration every part and clause of the act, and deduce from it the true meaning and intent of the parties.").

## VI.

We remand to the trial court for further proceedings in which the Directors will participate as a party with standing. Upon remand, the trial court's task will be essentially two-fold. First, the court must construe the statute to determine what it provides, especially with regard to the respective powers and responsibilities of the Trustees and the Directors, and the merits of the Directors' specific claims for relief. Second, it will be necessary to determine, in light of the provisions of the statute as construed, whether there are any issues of fact that must be decided or any legal issues that must be resolved bearing on any of the various counts of the complaint before judgment can be entered.

The trial court can, in its discretion, adopt appropriate procedures to make the necessary determinations. It will be necessary to give the parties the opportunity to adduce any additional materials bearing upon the construction of the statute that they can find. One may look of course to legislative history—a source of extrinsic aid—for guidance. *Onley, supra*, 399 A.2d at 86–87; *Davis v. United States*, 397 A.2d 951, 956–57 (D.C.1979); 2A SUTHERLAND, *supra*, § 48:04, at 431–36. It may prove appropriate to look beyond the process that led up to enactment. Without opining in advance on the relevance of particular materials, we note that one treatise has commented that useful extrinsic aids to the construction of a statute "consist of background information about circumstances which led to the enactment of [the] statute, events surrounding enactment, and developments pertinent to subsequent operation." *Id.* § 48:01, at 408–409. While appellee indicated at oral argument that it

---

**15.** The reasoning of *Casper* runs counter to the Directors' argument that the Trustees surrendered their exclusive authority to amend by-laws in agreeing to the Constitution as amended in 1958.

had made a full search for any relevant materials, appellant stated that there are available materials in the Library of Congress that it had not thoroughly perused. Upon further investigation, both parties may be in a position to make additional submissions. Contemporaneous journals or court records may shed light on the proper construction of the statute. *Id.* § 48:04, at 433–35.

The manner in which the interested parties construed and applied the statute in the months and years immediately following enactment may prove enlightening as to the proper construction of the statute. "The construction which parties put upon their contracts by their conduct is urged by appellees as of the highest value in settling its interpretation. This is true. As Lord Chancellor Sugden said in *Atty. Gen. ex rel. Quin v. Drummond,* 1 Drury & War. 363: 'Tell me what you have done under a deed, and I will tell you what that deed means.'" *Waters v. Kopp,* 34 App. D.C. 575, 580 (D.C.1910). It would be especially helpful, obviously, to be able to consider the "constitutions" (or by-laws) in effect at and soon after the time on enactment. That is not to say, however, that subsequent disregard of any provisions of the statute has annulled those provisions. *See Casper, supra,* 149 N.W. at 757. After the court has reviewed the statute with the aid of whatever additional extrinsic material it has before it, it will be for the court to articulate what the statute provides, especially with regard to the role of the Directors and whether the Trustees have the power under the charter to extinguish that role. While it is appropriate to use the term "finding" to refer to that articulation of the statute's meaning, *see* 2A SUTHERLAND, *supra,* § 48:03, at 425–27, the court does not make findings as a fact finder but rather serves in the recognized judicial role of construing statutes and devining legislative intent.[16]

The parties may contend, upon the completion of the court's task of statutory construction, that issues of fact remain to be resolved. Upon consideration of such arguments, the trial court will determine whether any issues of fact remains which require resolution by a finder of fact. If none remains, summary judgment may be appropriate. Dismissal may also be appropriate if, for example, the basis for disposition is a failure to state a cause of action in light of the court's construction of the statute. If genuine issues of material fact remain to be resolved, it will be necessary for the court to proceed to trial.

*Reversed and remanded for further proceedings consistent with this opinion.*

---

**16.** "Because issues concerning what a statute means or what a legislature intended are essentially issues of fact, even though they are decided by the judge and not by a jury, a court should never exclude relevant and probative evidence from consideration. It has also been held that statutory construction is a question of law, not fact, and where the lower court rules on a question of law, it is not a matter of discretion." 2A SUTHERLAND, *supra,* § 45:02, at 14–15. A somewhat similar situation arises when judges are called upon to make findings as to foundational facts affecting evidentiary rulings. 1 MCCORMICK ON EVIDENCE § 53 at 234–36 (John W. Strong ed., 5th ed.1999).