Thornton W. OWEN, Jr., James G. Mersereau, E. Tillman Stirling, Charles C. Wilkes and The Board of Trustees of the Washington City Orphan Asylum, appellants,

v.

## BOARD OF DIRECTORS OF THE WASHINGTON CITY ORPHAN ASYLUM, Appellee.

### No. 04–CV–1271.

District of Columbia Court of Appeals.

Argued Oct. 12, 2005.
Decided Dec. 22, 2005.

J. Alan Galbraith, Washington, for appellants.

Joel E. Richardson, Washington, with whom Lasagne A. Wilhite, Pingping Liu, Rashann Duvall, and Eric A. Rubel, Washington, were on the brief for appellee.

Before TERRY and RUIZ, Associate Judges, and NEWMAN, Senior Judge.

NEWMAN, Senior Judge:

This case has been here before. *Board of Directors of the Washington City Orphan Asylum v. Board of Trustees of the Washington City Orphan Asylum*, 798 A.2d 1068 (D.C.2002)(*WCOA I*). There, we reversed the two rulings of the Superior Court which were challenged on appeal and remanded the case to the trial court for further proceedings. Dissatisfied with the results of the remand, the Trustees of the Washington City Orphan Asylum (WCOA) (who had prevailed in the Superior Court in the original proceedings) bring this appeal. Being satisfied that the rulings of the trial court on remand were correct, we affirm.

## I.

## SUMMARY

In *WCOA I*, the Directors of WCOA challenged certain actions of the Trustees of WCOA by suing in Superior Court. That court ruled that the Directors lacked standing to bring the actions. In the alternative, the trial court ruled for the Trustees on the merits, concluding that as a matter of law, the plain language of the governing statutory provisions authorized the challenged actions of the Trustees. The trial court granted the Trustees' motion for judgment on the pleadings. On appeal, we reversed both rulings of the trial court. First, we held that the Directors did have standing because: (1) they, as well as the community interest they served, would suffer a cognizable injury from the Trustees' actions; and (2) the Directors had a "special interest" in enforcing the provisions of the charitable trust at issue. *WCOA I, supra*, 798 A.2d at 1075–76.

Second, we held that the trial court erred in ruling that the language of the statutory provisions was "unambiguous" and authorized the challenged actions of the Trustees. *Id.* at 1079. Holding that the statutory provisions were in fact ambiguous, we remanded the case to the trial court to construe the provisions of WCOA's statutory charter, applying the appropriate rules of statutory construction and considering specified extrinsic evidence. The trial court did so and ruled in favor of the Directors, and held the actions of the Trustees to be unauthorized; accordingly, it entered judgment in favor of the Directors. It is from this ruling that the Trustees bring the present appeal.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

WCOA[1] was founded in 1815 by First Lady Dolley Madison and other prominent

women in the District of Columbia. In 1816, these women attempted to incorporate. Because coverture laws prevented married women from holding and managing property, the legislators apparently considered that it would be imprudent (or impractical) to make the founders—all married women—the incorporators. Consequently, the women continued to operate the orphanage as a non-incorporated entity for approximately thirteen years.

On May 24, 1828, Congress adopted "[a]n Act to incorporate the trustees of the Female Orphan Asylum in Georgetown,[2] and the Washington City Orphan Asylum in the District of Columbia" ch. 88, 6 Stat. 381, (1828) [hereinafter the WCOA Charter].[3] The WCOA Charter consists of an

1. In 1927, WCOA began to operate under the name, "Hillcrest, A Children's Village." Sometime during the 1950s, Hillcrest ceased operating as an orphanage. In 1970, Hillcrest ceased its residential program entirely. Since then, Hillcrest has provided counseling services to indigent children in the District under the name Hillcrest Children's Center (HCC).

2. The Female Orphan Asylum in Georgetown, created by the same Act of Congress, is an entirely different entity and not relevant to this discussion.

3. The WCOA Charter provides:

    CHAP. LXXXVIII.—*An Act to incorporate the trustees of the Female Orphan Asylum in Georgetown, and the Washington City Orphan Asylum in the District of Columbia. Be it enacted, & c.,* . . . [Applies to the Female Orphan Asylum of Georgetown.]
    SEC. 2. *And be it further enacted,* That William Hawley, John P. Van Ness, Nathan Towson, Obadiah B. Brown, and James Larned, and their successors in office, to be appointed as is hereinafter directed, are hereby made, declared and constituted a corporation and body politic in law, and in fact, to have continuance forever, under the name, style, and title of "Washington City Orphan Asylum."
    SEC. 3. *And be it further enacted,* That all and singular the lands, tenements, rents, legacies, annuities, rights, privileges, goods, and chattels, heretofore given, granted, devised or bequeathed to either of said asylums, or to any person or persons for the use thereof, or that have been purchased for, or on account of the same, be, and they are hereby, vested in, and confirmed to, the said corporations respectively, and that they may purchase, take, receive, and enjoy any lands, tenements, rents, annuities, rights or privileges, or any goods, chattels or other effects, of what kind or nature soever, which shall, or may hereafter be given, granted, sold, bequeathed or devised unto either of them, by any person or persons, bodies politic or corporate, capable of making such grant, and to dispose of the same: *Provided,* The clear annual income of property to be acquired by either of said corporations, shall at no time exceed the sum of three thousand dollars.
    SEC. 4. *And be it further enacted,* That the said corporations respectively, by the name and style aforesaid, be, and shall be hereafter, capable, in law and equity, to sue and be sued, within the District of Columbia, and elsewhere, in as effectual a manner as other persons or corporations can sue or be sued, and that they shall adopt and use a common seal, and the same to use, alter or change at pleasure, to appoint a treasurer and secretary, and such other officers as they may deem necessary and proper, to assign them their duties, and fix their compensation, and to remove any or all of them, and appoint others, as often as they shall think fit, and to make such by-laws as may be useful for the government of the said asylum, and not inconsistent with the laws of the United States, or the laws in force in the District of Columbia, and the same to alter, amend or abrogate at pleasure.
    SEC. 5. *And be it further enacted,* . . . [Applies to the Female Orphan Asylum of Georgetown.]
    SEC. 6. *And be it further enacted,* That the present managers of the Washington City Asylum, called by the article of association "a board of trustees," may continue in office, discharging the duties of the same, until the second Tuesday in October next, at which time, and on the same day in each year thereafter, said corporation, by those who from their by-laws may be qualified to

introduction and seven enumerated sections. Section 2 of the WCOA Charter provides that five men, as well as their successors, would form a Board of Trustees constituting a "corporation and body politic in law." All but one of the five named Trustees was married to a "lady manager" of the asylum.

The WCOA Charter further specifies that the "female directresses and managers" and their successors, shall continue to superintend and manage the internal affairs of the asylum. *See* WCOA Charter, *supra* note 3, § 6. The current Board of Directors succeeds the Board of Lady Managers. Correspondingly, the present Trustees are the successors of that predecessor all-male board.

From 1828 until 2000, the two boards appeared to function cooperatively in facilitating the charitable endeavors of WCOA, and its successors. Pursuant to internal corporate documents called "Constitutions," the Directors managed the internal affairs of the orphan asylum, and subsequently, the HCC. The Trustees, on the other hand, invested the endowment and managed the property of the corporation. *See* WCOA Const., art. II (1897); WCOA

Const., art. II (1948); WCOA Const., art. II (1958). The Board of Trustees remained exclusively all-male and the Board of Directors was all-female until 1958, when the newly amended WCOA Constitution reflected a Board of Directors comprised of seventeen women and thirteen men. *See* WCOA Const., art. II (1958).

In 1998, the Trustees informed the Directors that they intended to cease funding HCC. Two years later, the Trustees repealed the WCOA Constitution, replacing it with a new set of by-laws that eliminated the role of the Board of Directors. The Trustees then advised the Directors that they would discontinue funding HCC beginning June 30, 2000.

The Directors challenged the Trustees' decision to oust them, filing a complaint in the Superior Court for injunctive relief and enforcement of trust. The Directors asserted that the Trustees had engaged in breach of fiduciary duty, arbitrary and capricious action, diversion of funds, conversion of funds and *ultra vires* acts in their management of the corporation and, as a result, demanded an accounting. The Trustees moved for judgment on the

vote, shall be regulated, and the officers thereof appointed, agreeably to the provisions of this act; that is to say, there shall be appointed a first, and a second female directress, and also fifteen female managers; and these directresses and managers, a majority of whom shall be necessary to do business, at such time and place as they may direct, shall appoint a treasurer and secretary, and such other officers; and also perform such other duties as the by-laws may direct: *Provided,* No by-law shall be enacted inconsistent with any law now existing in the District of Columbia.

SEC. 7. *And be it further enacted,* That when any destitute male or female child may be received into the asylum with the probation of the parent, guardian or friends who may have the care of said child, they shall not thereafter be at liberty to withdraw or leave the asylum without the consent of the directors, until, if a male, he shall attain the age of twenty-one years, or if a female the age of eighteen years: but, up to the periods and ages aforesaid, they shall remain subject to the direction of the asylum, or those to whom, by said asylum, they may be bound, unless by consent given by those directing the institution they may be exonerated from service previous to attaining those respective ages.

SEC. 8. *And be it further enacted,* That any vacancy which from death, resignation, or otherwise may happen in any of the offices or places of said asylum, shall be supplied or filled after the mode to be prescribed in their by-laws; and also in pursuance of said by-laws, power shall be possessed to alter and amend the same from time to time, and to remove and appoint to office whenever it shall be deemed advisable to do so.

APPROVED, May 24, 1828.

pleadings, contending the Directors lacked standing. The trial court agreed and awarded judgment on the pleadings. Alternatively, the trial court granted a judgment for the Trustees on the merits. We reversed, holding that the Directors possessed standing to sue, but remanded the case for the Superior Court to construe the ambiguous WCOA Charter. *WCOA I*, 798 A.2d at 1081.

We held that the Directors had standing to sue under two different theories. First, the Directors had an independent basis sufficient to satisfy standing requirements because the Directors, as well the community served by HCC, would suffer a cognizable injury should the Trustees terminate financial support. We further noted that the Directors asserted more than a generalized grievance because they would no longer be able to fulfill their role described in the WCOA Charter. *Id.* at 1074–75. Second, we held that rules governing charitable trusts could be applied to charitable corporations, thus giving the Directors standing to sue. *Id.* at 1075. As such, the Directors had a "special interest" in either the enforcement of a trust or as intermediate beneficiaries of a trust, distinct from that of the public, because the WCOA Charter assigned specific responsibilities to the directresses and managers. *Id.* at 1075–76.

We remanded the case to the Superior Court for it to construe the WCOA Charter. Noting that the WCOA Charter, in particular section 6, is ambiguous, we directed the trial court to determine the legislature's intent behind the WCOA Charter's enactment. We instructed the Superior Court to consider: (1) the respective powers and responsibilities of the Trustees and the Directors; (2) the merits of the Directors' specific claims for relief; and (3) if necessary, any outstanding factual or legal issues relating to the various counts of the complaint that required resolution prior to entering judgment. We noted that legislative history, background information leading to the enactment of the statute as well as events surrounding the enactment, the parties' course of conduct, and the WOCA Constitutions in effect near or at the time of enactment might prove useful when determining the WCOA Charter's meaning. *Id.* at 1081–82.

On remand, the trial court entered a Declaratory Judgment Order[4] construing the WCOA Charter to set forth a dual-board structure, with neither the Trustees nor the Directors enjoying plenary authority.[5] After construing the statute, the trial court ordered the parties to identify the remaining factual and legal issues to be resolved. At the same time, the trial court also granted the Board of Directors leave to amend the complaint so that they could name each trustee, in his individual capacity, as a defendant. The court also granted a motion for limited intervention purportedly filed by WCOA, but denied the intervenor's motion to dismiss on the same grounds it denied the Trustees' earlier mo-

---

4. At the request of both parties, the trial court amended the Declaratory Judgment Order, striking all references to unenumerated section 1 of the WCOA Charter. The substance of the original order, however, remained unchanged.

5. Specifically, the trial court determined, "[t]he Board of Trustees is not supreme over the Board of Directors, and the Board of Directors does not exist at the pleasure of the Board of Trustees. The Board of Trustees does not have the unilateral power or authority to terminate, expel, or oust the Board of Directors, or to dissolve WCOA and or its operations." The court further determined that "[a]ny decisions with respect to the governance, direction, control, and management of WCOA require the concurrence of both Boards."

tion to dismiss.[6] The Trustees petitioned this court for a writ of mandamus which was denied.

The Directors then sought summary judgment. The Directors sought an order compelling restitution of the monies spent by the Trustees on their defense in this litigation. In response, the Trustees moved for summary judgment and filed a motion under Super. Ct. Civ. R. 10, in which they sought to compel the individual Directors to be named as plaintiffs to facilitate any later court-awarded fees and costs.

While these motions were pending, the Trustees filed a second motion for summary judgment, asserting their immunity under the Volunteer Protection Act of 1997(VPA). 42 U.S.C. § 14501 *et seq.* (2000). In its opposition, the Directors contended that this new defense was untimely and, alternatively, that the VPA did not apply to actions in equity or to willful misconduct.

The trial court granted the Directors' motion for summary judgment and denied the Trustees' three pending motions. In its Order, the court enjoined the Trustees from: (1) exercising unilateral authority; (2) withholding funds from HCC's charitable operations; (3) diverting WCOA funds to other charities without the Directors' concurrence; and (4) acting on behalf of the organization without the concurrence of the Board. The court simultaneously ordered the Trustees to provide an accounting of their expenditures for the previous ten years and resume funding HCC at the rate of $20,000 per month. Lastly, the court ordered the Directors to prepare a Proposed Order for Restitution within twenty days after receiving the Trustees' accounting. The Trustees promptly appealed the summary judgment order.

Five days later, the Trustees sought to stay the injunction pending appeal. Before the trial court ruled on the motion, the Trustees filed an emergency motion to stay the injunction with this court which we denied.

The trial court then entered a judgment incorporating the terms of its Summary Judgment Order. The Trustees noted an appeal, and supplemented their emergency motion for a stay before this court.

Finally, on September 13, 2004, the trial court entered a restitution order requiring the Trustees to return to the corporation $395,393.75, the bulk of which was spent on legal fees. The Trustees noted an appeal. On October 20, 2004, this court consolidated the Trustees' three appeals.

## III.

## ANALYSIS

### A. *The Charter Provisions at Issue are Ambiguous*

The principal contention of the Trustees in this appeal (as in the prior one in *WCOA I*) is that the plain language of the WCOA Charter, particularly the language of section 2, in conjunction with sections 3 and 4, unambiguously confers plenary authority over corporate affairs on them. They assert that the trial court erred in ruling otherwise. We rejected this argument when it was made to us in *WCOA I* and do so again. As we said in *WCOA I*:

---

**6.** Here, the trial court denied the (individual) Trustees' motion to dismiss, rejecting their argument that (1) the claims against the four individuals were time-barred; (2) the claims could not be pursued under Supe. Ct. Civ. R. 19 for failure to join WCOA (the corporation) as an indispensable party, as a defendant; (3) the second amended complaint is a form of a derivative lawsuit but failed to meet the standards of Super. Ct. Civ. R. 23.1; and (4) the Directors failed to allege the lawsuit had been authorized by WCOA.

The Act of Congress creating WCOA is not clear on its face, as the language of the statute is capable of being understood in different ways. Most notably, Section 6 appears rife with ambiguities and lacunae .... As the Act of May 24, 1828 contains ambiguities, the trial court will be required to ascertain legislative intent .... Each provision of the statute should be given effect, so as not to read any language out of a statute "whenever a reasonable interpretation is available that can give meaning to each word in the statute" .... The charter's content and contemporaneous history should be utilized to construe the charter's meaning.

*WCOA I, supra,* 798 A.2d at 1079–80.

We directed the trial court on remand as follows:

First, the court must construe the statute to determine what it provides, especially with regard to the respective powers and responsibilities of the Trustees and Directors, and the merits of the Directors' specific claims for relief. Second, it will be necessary to determine, in light of the provisions of the statute as construed, whether there are any issues of fact that must be decided or any legal issues that must be resolved bearing on any of the various counts of the complaint before judgment can be entered.

*Id.* at 1081.

■ Our ruling in *WCOA I* is plain on its face; unambiguous; and binding on both us, *see M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) (holding that no division of the court may overrule another division;

only the en banc court can accomplish that result), and the parties. *See Washington Med. Ctr., Inc. v. Holle,* 573 A.2d 1269, 1280–81 (D.C.1990) (a valid final judgment on the merits absolutely bars the same parties from relitigating the same claim in a subsequent proceeding). The Trustees cannot relitigate this issue here.

## B. *The Evidentiary Record on Legislative Intent*

### 1. Contemporaneous Charters and Corporate Treatises

■ The Trustees contend that the trial court disregarded the contemporaneous [7] evidentiary record, namely the contemporaneous congressional charters and corporate treatises. Specifically, they contend that the trial court should have compared WCOA's Charter to those of Georgetown Asylum (1828), St. Vincent's Orphan Asylum (1831), and The Georgetown Free School and Orphan Asylum (1833). The Trustees assert that each charter follows the same format as WCOA's, noting that: (1) each charter affords "plenary corporate authority in named males and their successors;" (2) each charter designates an uneven number of males to constitute the respective corporate body; and (3) the obvious purpose behind selecting an uneven number of males was to avoid tie votes, thus allowing the corporation to act with one will. They contend the structure common to these charters confirms Congress' intent to place corporate authority in a "corporation and body politic" formed exclusively of men.

---

7. The Trustees assert that the trial court erred when it relied on historical documents that were not produced contemporaneously with the WCOA Charter's enactment. The Trustees' argument is without merit as this court in its earlier decision instructed the Superior Court to consider events leading up to and surrounding the enactment, as well as the parties' course of conduct. *WCOA I, supra,* 798 A.2d at 1081–82. *See also* SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 48:01, at 408–09 (Norman J. Singer ed., 6th ed.2001).

The Trustees further assert that contemporaneous corporate treatises illustrate that Congress intended the Trustees to operate as the governing board of the corporation. Quoting William Blackstone, amongst others, the Trustees note a corporation was "considered one person in law: as one person, they have one will, which is collected from the sense of the majority of the individuals: this one will may establish rules and orders for the regulation of the whole, which are a sort of municipal laws of this little republic." 1 WILLIAM BLACKSTONE; COMMENTARIES ON THE LAWS OF ENGLAND 455 (The Layton Press 1966). The Trustees interpret this language to mean Congress intended to bestow governance authority on the Trustees and did so by using the language "bodies politic . . . or corporations." *Id.* The Trustees also argue the failure of contemporaneous treatises to discuss corporations utilizing a dual-board structure suggests that a corporation formed in the 1800s could only be understood as having one governing board.

The Trustees' reliance on the contemporaneously enacted charters does not cause us to conclude the trial court erred. None of the charters cited by the Trustees contains language similar to that contained in section 6.[8] Although these charters reflect a structure similar to the Charter at issue here, so do the Charters of Harvard and Brown Universities—both of which provide for dual-board governance authority.[9]

---

8. A comparison of the language of these three charters demonstrates that the Trustees' interpretation is misguided. In Charter, St. Vincent's Orphan Asylum, Act of February 25, ch. 35, § 2 (1831), Congress explicitly refers to the "Trustees" when endowing the corporation with the power to manage the property of the corporation. Congress further suggests that the trustees possess governance control over the corporation when discussing the appointment of officers in sections 4 and 6, separately directing the Board of Lady Managers and the Board of Trustees as to when and how they should replace their respective officers, and describing what duties those officers owe to the corporation. Finally, when detailing the responsibilities and annual meetings requirements of the female directresses, Congress never references these responsibilities in the context of the "corporation." *Id.* at §§ 4, 6. Moreover, in Charter, Georgetown Female Orphan Asylum, 6 Stat. 88, § 5 (1828), Congress discusses the annual meeting of the contributors and it directs the female managers to "fill vacancies on their own board" but never mentions the role of the female managers in the context of the "corporation." Later in § 5, Congress notes that "a majority of the said trustees shall be a quorum, and authorized to act" without mention of the board of female managers. Finally, in Charter, Georgetown Free School and Orphan Asylum Charter, Act of March 2, ch. 88, § 5 (1833), Congress again explicitly refers to the "Trustees" when endowing the corpora-

tion with the power to manage the property of the corporation. *Id.* at § 2. Like St. Vincent's Charter, when detailing the responsibilities and annual meetings requirements of the female directresses, Congress never references these responsibilities in the context of the "corporation." *Id.* at § 4.

Conversely, in WCOA Charter, *supra* note 3, § 2, Congress details the corporate rights and responsibilities relating to land but never utilizes the term "Trustees" in conjunction with these rights. Moreover, in § 6 Congress allows that the present managers will continue in office until a designated time and then relates that once the new officers are elected "said corporation, by those who from their by-laws may be qualified to vote, shall be regulated." The modifier "their" suggests that both boards, including the Board of Lady Managers discussed two lines earlier, shall share in regulating the affairs of the corporation.

9. *See* THE GOVERNANCE OF BROWN UNIVERSITY, *available at* http://www.brown.edu/Adminstration/Governance/Corporation.html; RECORDS OF THE GOVERNING BOARDS OF HARVARD UNIVERSITY: A GUIDE, *available at* http://oasis.harvard.edu/html/hua12002frames.html. The Brown University and Harvard University Charters were enacted in 1764 and 1650, respectively. Thus, the dual-board structure provided for in the WCOA Charter is not the anomaly that the Trustees suggest.

Second, the Trustees' assertion that contemporaneous treatises interpreted the language "bodies politic or corporations" to bestow governance authority on one body is similarly misplaced. As the Charters of Brown and Harvard Universities demonstrate, the "one" governing body may be composed of two boards. The absence of dual-board corporations from the treatises' discussions does not render such a configuration implausible or harmful as the Trustees contend.

2. Legislative History and Historical Documents Surrounding the Charter's Enactment

Pre-incorporation historical documents as well as the legislative history reveal Congress' intent to name the men as "incorporators" of the asylum to circumvent the law of coverture. These records illustrate that prominent women of Washington founded WCOA as an unincorporated society in 1815. *See* JOHN C. HARKNESS, PROCEEDINGS IN MEMORY OF DR. JAMES C. HALL 16 (Gibson Bros. 1885); *see also* ANNUAL REPORT OF THE MANAGERS OF HILLCREST 3 (1938). At the society's first meeting, the women elected a first and second directress, a "board of trustees," a treasurer, secretary and nine "Lady Managers." The women then adopted a constitution and began fundraising and administering the charitable operations. For thirteen years, the women successfully governed the operation of the asylum without the assistance of men. HARKNESS, *supra*, at 16.

In 1816, the women attempted to incorporate, but such efforts failed because some Senators objected to forming "a body politic composed of married women." ANNALS OF CONGRESS, 14th Cong., 1st Sess. 189 (1816). In the 1816 proposed bill, all governance responsibilities were vested in the women in the proposed charter. *See* S. 56, 14th Cong. (1816). At this time, coverture laws prohibited married women from enjoying certain legal rights such as making contracts and bringing a lawsuit. *Fairclaw v. Forrest*, 76 U.S.App. D.C. 197, 200–01, 130 F.2d 829, 832–33 (1942).

A comparison of the 1816 bill with the 1828 bill supports the conclusion that Congress did not intend to the strip the Lady Managers of control over the asylum's affairs. First, in the introductory section of the 1816 bill, Congress designates that "[female subscribers to the] association now called the Washington Orphan asylum, shall be, and hereby are constituted a body corporate and politic." *See* S. 56, 14th Cong. (1816). In the next section, Congress vests the named Lady Managers and directresses with governance authority. *Id.* By contrast, the WCOA Charter substitutes five named males, all but one of whom was married to a directress or lady manager, in place of the term "female subscribers" in the introductory section.[10] *Compare id.* with WCOA Charter, *supra*, § 2. Moreover, the WCOA Charter contains language specifying that the corporation was to hold elections on the day of the first meeting of the newly-incorporated asylum to fill the same positions of directresses and female managers that existed pre-incorporation. WCOA Charter, *supra*, § 6. *See also*, WCOA Minutes of Founding Meeting (Oct. 10, 1815); Meeting Minutes for Oct. 14, 1816, Oct. 13, 1818, Oct. 12, 1819, Oct. 10, 1820.

---

**10.** The first section describing the WCOA Charter is numbered section 2 as the introductory section of the Charter discusses the Female Orphan Asylum in Georgetown.

3. The Parties' Course of Conduct Post–Incorporation Demonstrates their Understanding that the WCOA Charter Granted Dual–Board Authority

The post-incorporation conduct of both the Trustees and the Directors confirms their understanding that the WCOA Charter vested dual-board authority in the corporation. The trial court relied on historical documents surrounding the WCOA Charter's enactment to inform its interpretation. The first document, published in 1898, explains that "to give legal status to the institution, Congress by request of the board [comprised of the lady managers and directresses], incorporated it May 24, 1828, with William Hawley, John P. Van Ness, Nathan Towson, Obadiah Brown, and James Larned, trustees." JOINT SELECT COMMITTEE TO INVESTIGATE CHARITIES AND REFORMATORY INSTITUTIONS IN THE DISTRICT OF COLUMBIA: PART III. HISTORICAL SKETCHES OF THE CHARITIES AND REFORMATORY INSTITUTIONS IN THE DISTRICT OF COLUMBIA 110 (Charles Moore ed., 1898).

Several facts support the Committee's statement that Congress utilized named male trustees merely to comport with the perceived proper role of women and avoid the possible application of coverture laws, not to strip the women managers of authority over the charity they had founded. After the WCOA's incorporation, the Lady Managers continued to perform the same duties and administer the affairs of the asylum just as they had prior to incorporation. *See* Summary of the History of WCOA (undated), *available at* Library of Congress *in* Records of WCOA at LOC 0085. Their annual meetings continued post-incorporation. Notably, the first meeting held post-incorporation was referred to as "The Thirteenth Annual Meeting." WCOA Meeting Minutes (Oct. 14, 1828). The same individuals—that is, women officers—continued in office after the asylum's incorporation. Historical Notes and Partial Copies of Minutes of Annual Meetings (1815–1869).

Additional documents support the parties' understanding that the WCOA Charter bestowed dual-board authority to the corporation. One document discussed the dedication of Hall Memorial, part of WCOA property. At such time, one of the trustees, Dr. John C. Harkness, recalled several occasions where the Trustees consulted and included the Lady Managers and Directress in selecting real estate and drafting building plans. For example, after the Civil War, "the trustees, with the lady managers concurring" decided to purchase a new property to accommodate the increased number of orphaned children in the city. HARKNESS, *supra*, at 22. Once plans for the new orphanage were drawn up, they were "adopted by the lady managers and the board of trustees as well." *Id.* at 23. In 1880, there was additional need for expansion. The Boards, utilizing the bequest from Dr. Hall, decided to build an annex, "the plans for which were submitted to the board of trustees, and also to the lady managers, and by both boards approved." *Id.* at 25.

Similarly, in a 1924 memorandum of a joint board meeting, there is evidence suggesting the two boards shared decision-making responsibility. The subject of the May 20th meeting again concerned plans for a new building. One of the managers, Mrs. Birnie said "[t]here has been a misunderstanding. It was the expectation of the Lady Managers that we should make suggested plans as to the building." Memorandum of General Discussion at Joint Meeting of the Board of Directors and Board of Lady Managers of the Washington City Orphan Asylum (May 24, 1924). Mrs. Birnie then apologized to the Trus-

tees for the appearance of assuming unilateral responsibility for the project by forming "The Building Committee," composed solely of Lady Managers. *Id.* However, another manager eschewed diplomacy, remarking, "[y]ou handle the money but the ladies carry out the policy in the institution itself. We suppose, of course, we have something to say in regard to our needs . . . ." *Id.* The boards continued to debate the protocol to be followed when settling on the institution's architectural plans. Interestingly, another manager, Mrs. Cuniberti, suggested that the boards consult "the Constitution and By–Laws under which we operate and I wonder if a revival of the Advisory Committee would be a useful means of working out our preliminary planning." *Id.*

As summarized in a later WCOA internal report, "The arrangements of the two Boards, one having active control of the work and internal affairs, the other having the financial control and management of the invested and other funds . . . has been found to work satisfactorily in practice, and is in line with the method employed by a number of other charitable organizations in the District of Columbia and elsewhere." WCOA, 1916–1939 ANNUAL REPORTS & WCOA, 1940–1951 BIENNIAL REPORTS. None of these internal WCOA documents, however, describe the Trustees as the superior or final arbiter of corporate decisions and implementation. Instead, the historical documents surrounding the WCOA Charter's enactment reveal numerous instances where the two boards rendered important, mutually agreeable decisions affecting the corporation.

4. The WCOA Constitutions Further Demonstrates the Parties' Understanding of the WCOA Charter's Grant Of Governance Authority

A review of several versions of WCOA Constitutions further supports the trial court's interpretation of the Charter's grant of dual-board authority.[11] In the Constitution adopted May 3, 1897, Article V, which governed by-laws and amendments, reads "Each of said Boards shall have full power to make such By–Laws to regulate the time and manner of its meeting . . . ." WCOA Const. art V, § 1. This section goes on to describe that the By-laws control the conduct of the corporation's affairs subject only to "said Charter and [ ] this Constitution." Article V, § 2 states that "Either Board may, at any regular or duly called meeting . . . alter or amend this Constitution . . . ." *Id.* This language confirms that the parties understood, and thus recorded in their Constitution, that the WCOA Charter created two boards of equal stature.

Other provisions of the 1897 Constitution illustrate the parties' observance of dual-board authority over the corporation's affairs. In Article IV, the Boards created an Advisory Committee, composed of individuals from each Board. The committee was to report its findings regularly to both boards. In addition, the Constitution reveals that "upon matters concerning both domestic and financial management the

---

11. The Trustees allege that the trial court erred when it stated, "[t]his dual board structure is memorialized in WCOA's Constitution." The Trustees argue that although a "constitution" typically refers to a corporation's charter, the constitutions at issue here are in the nature of by-laws, and because they are unsigned, cannot be considered contracts. As a consequence, the constitutions should be construed as mere "internal" documents, and should be accorded no weight. The Trustees' argument again misses the point. Like the internal memoranda, these constitutions relate the course of conduct between the parties—evidence this court considered both relevant and proper to the task of construing the WCOA Charter.

concurrent actions of both Boards shall be necessary." *Id.* at art. IV. Thus, the formation of the Advisory Committee indicates that the Lady Managers were not simply relegated to performing "operational" functions as advocated by the Trustees. Although the 1948 and 1958 versions of the Constitution make no reference to an Advisory Committee, both contain nearly identical provisions governing the amendment or alteration to the By-laws. *See* WCOA Const. art. IV (1948); WCOA Const. art IV (1958). Thus, the various versions of WCOA's Constitution reflect a dual-board structure of governance.

Given the nature of the historical records available, the trial court properly utilized these records to construe an ambiguous and confusing Charter.[12] Such information reveals that both boards participated in rendering important decisions affecting WCOA, thus supporting the trial court's award of summary judgment to the Directors.

### IV.

### A. *The DCNCA Does Not Grant the Trustees Plenary Authority over the Corporation*

■ In the Superior Court, the Trustees both sought and opposed summary judgment, arguing that once the Trustees elected to accept the provisions of the District of Columbia Nonprofit Corporation Act (DCNCA)[13] and received the certificate of incorporation, they, as the identi-

fied "Board of Directors" in the election statement, possessed plenary authority to discontinue funding HCC.[14] The Certificate, they argue, is conclusive evidence that "all conditions precedent have been fulfilled and that the corporation has been formed" and cannot be subject to question by either the Superior Court or this court. The trial court disagreed, reasoning that since the Trustees did not act in conjunction with the Directors to obtain the certificate, the court had no obligation to give conclusive weight to the Certificate.

The trial court properly rejected the Trustees' argument that their status under the DCNCA affords them plenary authority over the corporation. While § 29–301–32 provides that the Certificate "shall be [considered] conclusive evidence," it properly functions as evidence to the outside world of the organization's corporate form. In this case, however, there is an internal dispute within the corporation. Given the facts of this case, the trial court did not err in affording little weight, if any, to the Certificate.

First, the Trustees unilaterally moved to elect to accept the provisions of the DCNCA. The record demonstrate that the Board of Directors explicitly objected to the Trustees' election decision. *See* Letter from R. Katerberg to J.A. Galbraith (July 8, 2002). The record further demonstrates that the application to the Department of Consumer and Regulatory Affairs (DCRA) represents that the Trus-

---

12. Indeed, in *WCOA I*, we noted approvingly that a leading authority had suggested that review of the parties' course of conduct and contemporaneous records be conducted in such circumstances. *WCOA I, supra*, 798 A.2d at 1081 (citing SUTHERLAND, *supra*, note 7, § 48:01, at 408–409).

13. D.C.Code § 29–301.01 *et seq.* (2001).

14. D.C.Code § 29–301.32 reads:

Upon the issuance of the certificate of the incorporation, the corporate existence shall begin, and such certificate of incorporation shall be conclusive evidence that all conditions precedent have been complied with and that the corporation has been incorporated under this subchapter, except as against the District of Columbia in a proceeding to cancel or revoke the certificate of incorporation.

tees possessed sole governance authority over WCOA and omits any reference to the Board of Directors or this lawsuit. *See* Statement of Election to Accept of the WCOA (June 12, 2003). The Trustees' lack of candor in their application cannot be ignored.[15] To do otherwise would mean condoning the Trustees' omission and misstatement of crucial information in its Statement. When an individual or business is afforded special privileges by a government or government proxy, and such privileges are obtained by way of misstatement or fraud, the appropriate remedy includes disregarding those privileges or indicia thereof. *See, e.g., Faulkenstein v. District of Columbia Bd. of Medicine,* 727 A.2d 302, 306 (D.C.1999) (upholding the revocation of an acupuncturist's license where the acupuncturist failed to satisfy requirements for licensure and used the license fraudulently); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1258–59 (Fed. Cir.1997) (holding at minimum, "the applicant should call the attention of the [Patent] Office to the litigation, the existence and the nature of any allegations relating to validity and/or 'fraud,' or 'inequitable conduct' relating to the original patent, and the nature of the litigation materials relating to these issues"). Thus, the trial court did not err in refusing to accept the Certificate as conclusive proof that the Trustees possessed plenary authority to act alone.

Second, even assuming that the Certificate constitutes conclusive proof of the Trustees' plenary authority, the Trustees' election decision violated specific provisions of the DCNCA; thus they cannot take haven under its provisions. The DCNCA provides that the issuance of a certificate does "not release or terminate any duty or obligation expressly imposed upon any such incorporation under and by virtue of the special act of Congress under which it was created." D.C.Code § 29-301.104(b). In its earlier opinion, this court noted that "the Directors had a role at the inception of the charter." *WCOA I, supra,* 798 A.2d at 1077. In its application to elect the DCNCA, the Trustees failed to include information regarding the Directors' role within the corporation. As a result, the new corporate charter under the DCNCA conflicts with WCOA's Congressional Charter. *Compare* WCOA Charter, *supra* note 3, § 6, *with* Statement of Election to Accept of the WCOA (July 12, 2003). When such a conflict exits, this court determined in *WCOA I* that the original terms of the WCOA Congressional Charter control under *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629 (1819). *WCOA I, supra,* 798 A.2d at 1076–77.

In *Dartmouth College,* the Court assessed whether the original charter of the college granted by the King of England in 1769 conflicted with statutes later enacted by the New Hampshire legislature in 1816. These statutes enlarged the board, empowered state authorities to appoint additional members, and provided for state authorities to oversee the board of trustees, all of which implicated provisions in the original charter. *Dartmouth College, supra,* 17 U.S. at 624–626. The Supreme Court held the 1816 acts to be impairments of contract, and therefore unconstitutional. *Id.* at 654.

Applying the rationale of *Dartmouth College* to this case, we previously concluded that if application of the DCNCA diminished the Directors' role under the WCOA

---

**15.** In fact, the DCRA has initiated an investigation as to whether the Trustees should have received the Certificate. *See* Memorandum from P. Grays, Superintendent of Corporations, to K. Edwards, DCRA General Counsel (July 11, 2003).

Charter, the terms of the WCOA Charter control, not those of DCNCA. *WCOA I, supra,* 798 A.2d at 1077. Surely the Trustees' decision to accept the provisions of the DCNCA, whereby they effectively eliminated the Directors' role under the Charter, implicated "dut[ies][and] obligation[s]" imposed by the WCOA Charter. Therefore, even if the Trustees' election decision was valid, both D.C.Code § 29–301.104(b) and *Dartmouth College* dictate that the contradictory provisions of the DCNCA must yield to those in the WCOA Charter. Thus, the trial court properly concluded that the DCNCA does not afford the Board of Trustees' plenary authority over the corporation.[16]

### B. *The Individual Trustees are not Immune from Liability Under the Volunteer Protection Act*

■ The Trustees assert they are absolved of personal immunity under the VPA because they were volunteers, acting in good faith. *See* 42 U.S.C. § 14501 *et seq.* (2000). Moreover, they assert that nothing in the VPA's language restricts immunity to acts of negligence only. The trial court rejected the Trustees' argument. We need not decide this question, for even if the terms of the VPA are applicable to actions in equity, the Trustees' decision to discontinue funding and oust the Board of Directors exceeded the scope of their responsibilities. Thus, the Trustees cannot immunize their conduct under the terms of the VPA.

The Act affords immunity to those "acting within the scope of [their] responsibilities in the nonprofit organization." *See* 42 U.S.C. § 14503(a). The Trustees' decision to discontinue funding HCC and oust the Board of Directors is inconsistent with the language of the WCOA Charter; that is, the decision to cease funding fell outside the scope of the volunteers' responsibilities. Where decisions implicate the governance structure of the corporation or the corporation's charitable mission, the WCOA Charter requires concurrent action of the two boards. Even assuming that the immunity afforded by the VPA extended to actions in equity, the Trustees' conduct of ousting the Directors and ceasing all funding to HCC renders the statute inapplicable. *See* WCOA Charter, *supra* note 3, § 6. Therefore, the trial court committed no error when it failed to immunize the Trustees' conduct under the VPA.

### C. *The Trial Court Possessed Equitable Power to Order Restitution Where the Individual Trustees were Afforded Legal Counsel at the Corporation's Expense*

■ The Trustees contend that the trial court's restitution order is invalid, asserting that WCOA suffered no damage as a result of their decision to discontinue funding HCC and that the individual Trustees derived no benefit from the corporation's payment of legal fees on their behalf. They further assert that since HCC's funding was discontinued, the corpus of WCOA's assets has increased. Finally,

16. Since the Certificate does not constitute conclusive evidence of the Trustees' plenary authority, and we have determined that the provisions under the DCNCA conflict with those of the WCOA Charter, we reject the Trustees' argument that they are entitled to immunity under the provisions of the DCNCA. Section § 29–301.113(b)(5) states that immunity will not be afforded to a volunteer whose "act or omission that is not in good faith and is beyond the scope of authority of the corporation pursuant to this subchapter or the corporate charter." Here, the Trustees filed the Statement in the face of the Directors' objection in an attempt to eliminate the role of the Board of Directors. Such action contradicts the responsibilities prescribed by the WCOA Charter. As such, immunity is not available to the Trustees under D.C.Code § 29–301.113.

they assert that their most recent version of the by-laws allowed for the corporation's expenditure on their defense. We reject the Trustees' argument for two reasons: (1) the decision to discontinue funding HCC impeded the Directors' ability to carry out the corporation's charitable mission and disadvantaged the population that HCC serves; and (2) without the corporation's payment of the Trustees' legal fees, the Trustees would have had to expend that cost themselves.[17]

Pursuant to the trial court's order for an accounting under Super. Ct. Civ. R. 58, the Trustees filed an Accounting and Supplement complete with several objections. Upon consideration of those documents, the trial court ordered restitution based on: (1) the Trustees' unilateral efforts to restructure WCOA, which included $16,444.87 of expenditures paid to Williams & Connolly LLP for services rendered from June 1999 to June 2000, and Ms. Ruth E. Rucker, whom the Trustees hired in 2000 to consult on alternative uses of WCOA's assets; (2) the Trustees' unauthorized expenses between the inception of this case in June of 2000 and the court's Declaratory Judgment Order issued on November 19, 2003, which included $233,847.67 paid in legal fees to Williams & Connolly LLP and $1,427.59 paid to Ms. Rucker; (3) the unlawful exercise of authority after declaratory judgment, which included $3,793.65 in legal fees paid to Williams & Connolly LLP; and (4) the unlawful exercise of authority after the trial court's affirmation of declaratory judgment in March 2004, which included another $139,879.97 in legal fees paid to Williams & Connolly LLP. The trial court ruled that each Trustee shall be held jointly and severally liable for the restitution ordered.

■ The trial court possessed equitable power to order restitution. The equitable powers of the trial court to effect remedies are wide and absent an abuse, they should not be circumscribed. *See Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (holding that the trial court possessed broad discretionary power when crafting a remedy based upon equitable restitution, thereby requiring narrow appellate review). Here, the Trustees ceased funding a longstanding charitable activity of the corporation and ousted the Directors, exceeding their role as provided by the WCOA Charter and eliminating the role of the Directors. After exceeding that role, the Trustees utilized corporate funds to defend their actions. Although the most recent version of the by-laws provides that the corporation may expend funds to defend the Board of Trustees, these by-laws were unilaterally passed by the Trustees after they had ousted the Board of Directors. By-laws of the WCOA art. V, § 2 (Feb. 25, 2000). The Trustees' reliance on them is unavailing.[18]

---

17. The Trustees insist that they cannot be ordered to make restitution for any legal fees expended when the caption did not reflect the trustees, in their individual capacities, as defendants to this suit. The trial court refused to dismiss this case based on the Trustees' contention that the Directors' complaint failed to name a valid party defendant and later allowed the Directors leave to amend the complaint to reflect the addition of the individual trustees' names in the caption.

18. We find no merit in the remaining arguments presented by the Trustees. The trial court's injunction and restitution order were properly addressed to the Trustees. We likewise reject the Trustees' renewed contention that the Directors lacked standing. *WCOA I, supra,* 798 A.2d at 1077.

■ We review the trial court's construction of a statute *de novo* as a question of law. *In re Doe,* 855 A.2d 1100, 1102 (D.C.2004). Having done so, we conclude that the trial court's construction of the WCOA Charter is correct. In all respects, the judgment of the trial court is affirmed.

*So ordered.*